# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAINE HALE, Individually and as<br>Administratrix of the Estate of Derek J. Hale,<br>DENNIS W. HALE, and CONNIE M. HALE, | : <br> : <br> : <br> : | |
| Plaintiffs, | : <br> : | |
| v. | : <br> : | C.A.No. 07-166-*** |
| Lieutenant WILLIAM BROWNE; Sergeant<br>ANGEL ALVERIO; Corporal HECTOR<br>CUADRADO; Corporal ROBERT<br>CUNNINGHAM; Corporal CHARLES<br>EMORY, JR.; Corporal MITCHELL RENTZ;<br>Corporal JEFFREY SILVERS; Corporal<br>GEORGE TAYLOR; Corporal JOSEPH<br>LEARY; Corporal RANDOLPH PFAFF;<br>Corporal DANNY SILVA; Chief MICHAEL J.<br>SZCZERBA, in his official capacity; CITY OF<br>WILMINGTON, a municipal corporation;<br>Lieutenant PATRICK OGDEN; Sergeant<br>DARREN LESTER; Sergeant RANDALL<br>HUNT; Sergeant ALBERT PARTON; Detective<br>VINCENT CLEMONS; Detective DAVID<br>CHORLTON; Captain CHARLES J.<br>SIMPSON; Major ALBERT HOMIAK; Major<br>JOSEPH PAPILI; Colonel THOMAS F.<br>MacLEISH, individually and in his official<br>capacity; DIVISION OF STATE POLICE,<br>DEPARTMENT OF SAFETY AND<br>HOMELAND SECURITY, STATE OF<br>DELAWARE, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Jury Trial Demanded |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT[1]

### I.     SUMMARY.

1.     This is a civil action for the tragic and unnecessary death of Derek J. Hale, a twenty five year-old, recently retired Marine Corps Sergeant.  While executing a misdirected Delaware State Police tactical operation, a band of undercover Wilmington Delaware police officers stormed Derek as he sat peacefully on a front porch step with a mother and her two young children.  Without ever identifying themselves, the officers tasered Derek three separate times.  And then, as Derek sat - incapacitated and vomiting as a result of the tasers - the police shot him in the chest, three times, at close range, killing him.

2.     Derek's brutal killing took place in broad daylight, in the presence of at least three civilian eyewitnesses.  No crime was in progress at the time of the killing, and Derek posed no threat to the officers or anyone at the scene.  To the contrary, at the time of the shooting, excessive tasering had left Derek virtually paralyzed, unable to comply with the police officers demands, and in no way capable of harming, the at least eleven, specially trained and heavily armed men who surrounded him.

3.     As eyewitness testimony confirms, the assault team never identified themselves as police officers and never warned Derek that deadly force could be used against him.

4.     In tasering and shooting Derek, the officers violated all preexisting written rules and regulations of the Delaware State Police ("DSP") and the Wilmington Police Department

---

[1]  No Answer having been filed, pursuant to Fed.R.Civ.P. 15(a), plaintiffs amend their Complaint as of right.  The caption and text have been amended to reflect that the John Doe defendants have been replaced with ten named WPD officers.  Additionally, all Richard Roe defendants have been removed.  If discovery subsequently reveals the involvement of any remaining Troopers, the Complaint will be amended pursuant to Fed.R.Civ.P. 15(a), and the Rule 16 Scheduling Order.

("WPD") governing the use of deadly force and tasers.

## II.     JURISDICTION AND VENUE.

5.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and 2202, and the First, Fourth and Fourteenth Amendments to the United States Constitution.  The cause of action arises under 42 U.S.C. § 1983.  A substantial part of the events or omissions giving rise to the claims occurred in this district.  All Defendants also reside in this district.  This case also arises between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, which provides for supplemental jurisdiction.

## III.    NOTICE OF CLAIM.

6.     Plaintiffs filed a Notice of Claim with the City Solicitor of the City of Wilmington and the Attorney General of the State of Delaware in a letter dated November 28, 2006.

## IV.     PARTIES.

### A.     Plaintiffs.

7.     Plaintiff ELAINE HALE is a citizen and resident of the Commonwealth of Virginia and a citizen of the United States.  She is Derek Hale's widow and the Administratrix of his estate.

8.     Plaintiff DENNIS W. HALE is a citizen and resident of the State of Missouri and a citizen of the United States.  He is the father of Derek.

9.     Plaintiff CONNIE M. HALE is a citizen and resident of the State of Missouri and a citizen of the United States.  She is the mother of Derek.

B.      **Defendants.**

1.      **City of Wilmington Defendants.**

10.     WILLIAM BROWNE – At all relevant times, Defendant BROWNE was a Lieutenant in the WPD and a SWAT team commander. He shot and killed Derek. Defendant BROWNE has a history of participating in cover-ups of excessive force incidents. The WPD is aware of his history and is in possession of a videotape of then Sgt. Brown coaching three WPD officers involved in a fatal shooting incident about how to make the shooting appear legitimate. He is a citizen of the State of Delaware. Defendant BROWNE is sued in his individual capacity.

11.     ANGEL ALVERIO – At all relevant times, Defendant ALVERIO was a Sergeant in the WPD. He is a member of the WPD Drug and/or SWAT units. He is a citizen of the State of Delaware. Defendant ALVERIO is sued in his individual capacity.

12.     HECTOR CUADRADO – At all relevant times, Defendant CUADRADO was a Corporal in the WPD. He is a member of the WPD Drug and/or SWAT units. He is a citizen of the State of Delaware. Defendant CUADRADO is sued in his individual capacity.

13.     ROBERT CUNNINGHAM – At all relevant times, Defendant CUNNINGHAM was a Corporal in the WPD. He is a member of the WPD Drug and/or SWAT units. He is a citizen of the State of Delaware. Defendant CUNNINGHAM is sued in his individual capacity.

14.     CHARLES EMORY, JR. – At all relevant times, Defendant EMORY was a Corporal in the WPD. He is a member of the WPD Drug and/or SWAT units. He is a citizen of the State of Delaware. Defendant EMORY is sued in his individual capacity.

15.     MITCHELL RENTZ – At all relevant times, Defendant RENTZ was a Corporal in the WPD. He is a member of the WPD Drug and/or SWAT units. He is a citizen of the State of Delaware. Defendant RENTZ is sued in his individual capacity.

16.     JEFFREY SILVERS – At all relevant times, Defendant SILVERS was a Corporal in the WPD.  He is a member of the WPD Drug and/or SWAT units.  He is a citizen of the State of Delaware.  Defendant SILVERS is sued in his individual capacity.

17.     GEORGE TAYLOR – At all relevant times, Defendant TAYLOR was a Corporal in the WPD.  He is a member of the WPD Drug and/or SWAT units.  He is a citizen of the State of Delaware.  Defendant TAYLOR is sued in his individual capacity.

18.     JOSEPH LEARY – At all relevant times, Defendant LEARY was a Corporal in the WPD.  He is a member of the WPD Drug and/or SWAT units.  He is a citizen of the State of Delaware.  Defendant LEARY is sued in his individual capacity.

19.     RANDOLPH PFAFF – At all relevant times, Defendant PFAFF was a Corporal in the WPD.  He is a member of the WPD Drug and/or SWAT units.  He is a citizen of the State of Delaware.  Defendant PFAFF is sued in his individual capacity.

20.     DANNY SILVA – At all relevant times, Defendant SILVA Was a Corporal in the WPD.  He is a member of the WPD Drug and/or SWAT units.  He is a citizen of the State of Delaware.  Defendant SILVA is sued in his individual capacity.

21.     CHIEF MICHAEL J. SZCZERBA – At all relevant times, Defendant SZCZERBA was the Chief of the WPD.  Defendant SZCZERBA is sued in his official capacity for injunctive relief only.

22.     CITY OF WILMINGTON ("the City") – At all relevant times, Defendant CITY OF WILMINGTON was a municipal corporation organized under the laws of the State of Delaware that operates the WPD as one of its municipal departments.

### 2.     Delaware State Police Defendants.

23.     PATRICK OGDEN – At all relevant times, Defendant OGDEN was a Lieutenant

in the DSP. Ogden was the Deputy Commander for the Northern Operations (New Castle County) of the Special Investigations Unit ("SIU") that specializes in, inter alia, drug enforcement. He is also a fifteen year member of the Special Operations Response Team ("SORT") and served as the Alpha team leader of the SORT Unit during the relevant time period. He is a citizen of the State of Delaware. Defendant OGDEN is sued in his individual capacity.

24.    DARREN LESTER – At all relevant times, Defendant LESTER was a Sergeant in the DSP and commanded the Drugs North ("D/N") Section of the SIU. He participated in the wrongful actions recounted herein. He is a citizen of the State of Delaware. Defendant LESTER is sued in his individual capacity.

25.    RANDALL HUNT – At all relevant times, Defendant HUNT was a Sergeant in the DSP. He presently serves in the Criminal Intelligence Unit. He is a citizen of the State of Delaware. Defendant HUNT is sued in his individual capacity.

26.    ALFRED PARTON – At all relevant times, Defendant PARTON was a Sergeant in the DSP. He is the Non-Commissioned Officer-in-Charge ("NCOIC") of the SORT team. The SORT team under his command participates in the great majority of major drug arrests for the DSP and at least two of the officers under his command were present on scene and participated in Derek's attempted arrest and slaying. He is a citizen of the State of Delaware. Defendant PARTON is sued in his individual capacity.

27.    VINCENT CLEMONS – At all relevant times, Defendant CLEMONS was a Detective in the DSP and a member of the SIU and/or SORT units. He participated in the wrongful actions recounted herein. He is a citizen of the State of Delaware. Defendant CLEMONS is sued in his individual capacity.

28.    DAVID CHARLTON – At all relevant times, Defendant CHARLTON was a

6

Detective in the DSP and a member of the SIU and/or SORT units. He participated in the wrongful actions recounted herein. He is a citizen of the State of Delaware. Defendant CHARLTON is sued in his individual capacity.

29.    CHARLES J. SIMPSON – At all relevant times, Defendant SIMPSON was a Captain in the DSP with responsibility for the SIU. He participated in, ratified, sanctioned, approved or authorized the wrongful actions recounted herein. He is a citizen of the State of Delaware. Defendant SIMPSON is sued in his individual capacity.

30.    ALBERT HOMIAK – At all relevant times, Defendant HOMIAK was a Major in the DSP with responsibility for the SIU. He participated in, ratified, sanctioned, approved or authorized the wrongful actions recounted herein. He is a citizen of the State of Delaware. Defendant HOMIAK is sued in his individual capacity.

31.    Under Homiak's command, the SIU conducted a long-term investigation into the activities of members of a national motorcycle organization known as the Pagans. As a member of the Pagans, Derek was a person of interest in these investigations. Defendants Homiak, Papili, and MacLeish were personally informed of the surveillance of Derek's activities throughout this investigation. Homiak was personally aware of all DSP actions taken relating to Derek both before and after his death. He personally knew of the false allegations regarding Derek which were made by Defendant Ogden.

32.    JOSEPH PAPILI – At all relevant times, Defendant PAPILI was a Major in the DSP with responsibility for the SORT team. He participated in, ratified, sanctioned, approved and/or authorized the wrongful actions recounted herein. He is a citizen of the State of Delaware. Defendant PAPILI is sued in his individual capacity.

33.    THOMAS F. MacLEISH – At all relevant times, Defendant MacLEISH was the

Colonel and Superintendent of the DSP.  He participated in, ratified, sanctioned, approved and/or authorized the wrongful actions recounted herein.  He is a citizen of the State of Delaware. Defendant MacLEISH is sued in his individual and official capacities.

34.    DIVISION OF STATE POLICE, DEPARTMENT OF SAFETY AND HOMELAND SECURITY, STATE OF DELAWARE – At all relevant times, Defendant Division of State Police, Department of Safety and Homeland Security, State of Delaware, was a state agency.  The State of Delaware is only joined in this action for purposes of collecting attorneys' fees and costs.

## V.    COLOR OF LAW.

35.    At all times material hereto, the individual Defendants and their agents were acting under the color of state law and participated in, authorized, ratified, approved, and/or sanctioned the violations of clearly established federal constitutional rights of which any reasonable official would have known.  The federal constitutional deprivations described herein are fairly attributable to the individual Defendants, the municipality, and the State.

## VI.    FACTS GIVING RISE TO THE ACTION.

### A.    Background of Sgt. Derek J. Hale, USMC, Ret.

36.    Sergeant Derek J. Hale was born in Cape Girardeau, Missouri, on October 2, 1981, to Plaintiffs Dennis and Connie Hale.  After graduating high school, he joined the United States Marine Corps on January 17, 2001 where he served honorably for five years, including two tours of duty in Iraq.  While serving in the Marine Corps, he attained the rank of Sergeant and his awards included the Navy Unit Commendation and the Presidential Unit Citation – Navy. Derek was honorably discharged from the Marine Corps on January 16, 2006 with a service related disability.

8

37.     Prior to his discharge, on October 22, 2005, he married plaintiff Elaine Hale in Newport News, North Carolina.

38.     Derek also joined the Pagan Motorcycle Club of Virginia ("Virginia Club"), an organization composed of many military veterans from all four service branches.  There, he found the sense of brotherhood, camaraderie, and *espirit de corps* that he had been missing and was able to ride his motorcycle in a relaxed atmosphere.

39.     Derek was twenty-five when the Wilmington police officers shot and killed him. At the time of his death, Derek resided in Manassas, Virginia, with his wife and her two children by a prior marriage.

40.     Derek joined the Virginia Club in March of 2006 when, after retiring from the Marine Corps, he purchased a motorcycle.  Although Derek was not a member of the Delaware Club, his friendship with several members of Delaware Club made him a person of interest in the DSP investigation, as well.  The DSP opened a file on Derek and exhaustively investigated his background.

**B.     The Ongoing DSP Investigation.**

41.     In early 2005, Defendant MacLeish, the DSP, and the individual DSP Defendants (collectively "DSP" or "DSP Defendants") opened an unjustified investigation into the Pagan Motorcycle Club ("Delaware Club").

42.     MacLeish intended for the investigation to generate some positive publicity for the DSP in the wake of intense criticism by the Delaware media.

43.     Any law enforcement objectives behind the investigation were strained and attenuated.  No federal FBI, DEA, or other law enforcement body thought there was a need for this investigation.

44.     As part of its probe, the DSP fully and exhaustively investigated the background of each and every person who associated with the Delaware Club.

45.     This DSP investigation revealed that Derek was a decorated Marine, a model citizen, had no criminal record, had no history of substance abuse, and had no history of mental illness.

46.     The DSP also learned that Derek had no history of violence and instead was a quiet, friendly, unassuming, peaceful person.   Moreover, the investigation revealed no evidence that Derek had committed any crimes.

47.     Defendants MacLeish, Homiak, Papili, Simpson, Ogden, and Hunt each had personal knowledge of these facts.

48.     Given the absence of evidence of wrongdoing, the DSP was unable to formulate, develop, or otherwise articulate any type of probable cause to obtain a warrant to arrest Derek at any point during their investigation.

**C.     Derek Travels to Delaware to Participate in a Toys for Tots Run.**

49.     The Delaware Club has a proud history of participation in Toys for Tots runs.  On the weekend of November 3, 2006, the Delaware Club sponsored one such run and only two weeks later, on November 18, 2006, a representative of the Boys & Girls Clubs of Delaware presented an award to the Delaware Club in recognition of their long history of participation in Toys for Tots.

50.     When Derek heard about the Delaware Club's participation in the Toys for Tots run scheduled for the weekend of November 3, 2006, he decided to travel to Delaware to take part and help raise money to buy toys for needy children.

**D.    Derek's Last Day Alive.**

51.    Following the Toys for Tots run, on Monday, November 6, 2006, Derek house-sat at the home of a Delaware Club member at 1403 W. 6th Street in Wilmington, anticipating his return home to Virginia.

52.    Around 4:00 p.m., Ms. Sandra Lopez, who was divorced from the primary occupant of that house, arrived in her Volvo with her eleven-year-old son and six-year-old daughter.  Lopez shared custody of her eleven-year-old son with her ex-husband, who she had just learned was not going to be home for several days.  As a result, she stopped by the house to pick up some of her son's belongings and his pet dog and also to feed and let out a second dog which also lived at the house.

53.    Upon arrival at the house, Ms. Lopez left her children in the car and walked up to the front door but found that it was locked.  She then wrote a note and stuck it in the door jam.

54.    She then walked around to the back of the house and her two young children followed her.  When she reached the back of the house, she met Derek who had let the two dogs out into the backyard.

55.    Derek was wearing jeans, a pullover sweatshirt with front pockets in it, a baseball cap and glasses.  He was not wearing any sort of gang colors and in the words of one eye-witness, "he did not look like a gang member."

56.    Derek and Ms. Lopez chatted amicably, and Ms. Lopez asked Derek if he would help her gather some of her son's belongings from inside the house, which he agreed to do.  Ms. Lopez then walked back around to the front door with her two children, while Derek walked through the house to unlock the front door.

57.    Ms. Lopez then had her children go wait in her Volvo, while she went inside with

11

Derek and gathered up some of her son's video games and clothing, which she put into two canvas bags and a plastic tub that Derek proceeded to carry out to the Volvo.

58.    While the door was open both dogs escaped and, after placing the bags and containers into the car, Derek and Ms. Lopez ran up and down the street attempting to corral the dogs before finally catching them.

59.    After helping Ms. Lopez carry her children's belongings to her Volvo and retrieve the escaped dogs, Derek walked up the steps of 1403 W. 6th Street and sat down with his hands in his front sweatshirt pockets.  Ms. Lopez then sat down with him and they talked with each other for a few minutes.

60.    Meanwhile, Ms. Lopez's eleven-year-old son and six-year-old daughter climbed out of the Volvo and came up the steps to where Derek and Ms. Lopez were seated and began talking to their mother and Derek.  The six-year-old daughter then began playing in the front yard, while the eleven-year-old tried to go inside to retrieve his X-Box video game system.

61.    At about the same time, two construction contractors pulled up directly across the street in their vehicles.  One, Mr. Harold Mixson, climbed out of his car and walked up the steps of 1405 W. 6th Street to tell his construction crew that the work day was at an end.  While walking up the steps, he waved to Derek who responded and smiled back at him.

62.    Upon speaking to his construction crew, Mr. Harold Mixson then walked back out and stood outside his car on 6th Street and chatted with the second contractor, his brother, Mr. Fred Mixson, who also had gotten out of his van.

**E.    DSP Wiretap and Active Surveillance of the Scene.**

63.    For several months prior to Derek's death, the DSP had been using electronic surveillance with regards to an ongoing investigation.  Through this surveillance, they had

12

intercepted some of Derek's calls, although he was not the targeted speaker. The calls provided the DSP with further knowledge that Derek posed no threat to any law enforcement officer and was not a violent or dangerous individual.

64.     The DSP also, just three hours prior to his death, conducted an extensive, and potentially illegal wiretap of two telephone conversations by Derek that indicated that there was no probable cause to arrest him for any offense and that he was a peaceable and law abiding person who just was house-sitting at 1403 W. 6th Street until 9:00 pm that evening.

65.     The wiretap logs from November 6, 2006 reveal that Derek was neither a flight risk nor a threat to anyone, that he was in the rough neighborhood house-sitting to ensure the premises remained secure in light of the fact that at least five persons had tried to enter the premises, and that he was in Wilmington for the Toys for Tots run.

66.     Upon information and belief, the wiretap was potentially illegal because it was conducted for more than thirty seconds after just innocuous small talk had passed.

67.     DSP and the WPD units were also aware, due to a search and investigation of the 1403 W. 6th Street premises over the prior weekend, that there were no weapons in the house, no illegal activities occurring, and no illegal substances anywhere on the premises. And since the prior search and investigation, upon information and belief, the house had been under constant surveillance so as to have provided the police with actual knowledge that the house and its inhabitants were both clean and clear of any illegal or illicit substances or weapons.

68.     In the hours leading up to Derek's death, DSP surveillance units were watching Derek's activities at 1403 W. 6th Street and observed all his actions occurring in the back and front of the house. Upon information and belief, the units used high-tech visual and audio surveillance equipment to conduct this operation and were aware of all of Derek's actions and

13

words.

69.    The surveillance team observed:

a)    Ms. Lopez's arrival at the house and the presence of her two young children who were playing and talking with their mother and Derek on the front steps of 1403.

b)    Derek and Ms. Lopez chasing the two escaped dogs down the street and that due to the nature of Derek's clothing it was unlikely that he possessed a weapon in his sweatshirt pocket.

c)    Derek was a peaceful individual who was amicably chatting with and helping Ms. Lopez while talking and playing with her two young children.

d)    Derek did not act in any kind of a threatening or suspicious manner.

e)    Derek was not holding these three persons hostage and there was no need for imminent action to rescue them.

f)    Derek was not carrying any type of weapon.

g)    Derek and Ms. Lopez were simply having a friendly conversation filled with small-talk.

h)    Derek did not make any verbal threats and was instead acting in an amicable manner.

70.    The surveillance team relayed all of this information back to the members of the DSP and WPD, who were gathering in a staging area a short distance away.

**F.    The WPD and DSP Arrive on the Scene.**

71.    Nevertheless, suddenly, and without warning, three unmarked police vehicles containing WPD and DSP officers swarmed the house. One came down 6th Street, going east, while two more drove the wrong way up 6th Street, going west.

72.    There was no marked police vehicle in plain view operating as backup and as notice to the general public that a police tactical operation was underway. And there was no uniformed police officer standing outside a marked police vehicle as required per Standard

14

Operating Procedures.

73.    At least eleven heavily armed individuals wearing dark colored clothing swarmed

out of these vehicles, rushed in and surrounded Derek, Ms. Lopez, and her two children.

74.    None of the officers: (1) ever identified themselves as police or law enforcement

officers, as is required by DSP and WPD policy, (2) were displaying police badges, (3) were

wearing police uniforms, (4) had the words 'POLICE' across their chests in large letters, (5) were

wearing any clothing that could have reasonably put Derek, who was facing them, on notice that

they were law enforcement officers, or (6) ever stated why they were there or that they wanted to

arrest Derek.

75.    After Derek's death, it was revealed that these individuals were WPD and DSP

officers that included the individual Defendants.  However, this fact was not apparent or

reasonably known at the time.

76.    This failure to identify themselves immediately as law enforcement officers or to

make known the purpose of the attempted arrest violates state statutes, such as 11 Del. Code §

467, numerous WPD and DSP rules and regulations, as well as national and local law

enforcement standards and practices.

77.    Moving in and executing a tactical assault such as this, in the presence of innocent

third persons, such as Ms. Lopez, her six-year-old daughter and her eleven-year-old son, violates

numerous state statutes, such as 11 Del. Code § 467, numerous WPD and DSP rules and

regulations, as well as national and local law enforcement standards and practices.

78.    As they rushed and surrounded Derek, at least eleven heavily armed individuals

shouted in a loud cacophony of voices, "Put your hands up or we're going to taser you."  But no

one ever said "Police!  Put your hands up or we're going to taser you."

79.    This tactic of a sudden, unexpected, and overwhelming show of force and movement while shouting in a loud clamor of voices is a well-known law enforcement tactic, generally known as 'sensory overload,' and is intended to overwhelm an individual's auditory and visual senses, so as to stop the brain from responding, thereby freezing the party overtaken.

80.    At that point, officers are supposed to continue to move into a position to get 'hands on' the target and close enough to the suspect so that they can physically subdue him, while his senses are overwhelmed and while other officers have the suspect covered with a weapon aimed at him.  In this manner the incident can be ended quickly and without any dangerous escalation of the level of force involved.

81.    But the individual Defendants on scene did not do this because it was their purpose to give him no quarter.  Rather, while he was dazed and stunned the Defendants escalated their attack.

**G.    Derek Is Immediately Tasered Without Warning.**

**1.    First Tasering.**

82.    Without giving Derek any time or chance to comply and in the absence of any difficult, tense, or uncertain situations created by Derek, in the words of three civilian eyewitnesses, a WPD officer "immediately" tasered him for several seconds as he sat on the step.

83.    Derek was not combative, physically aggressive, or actively resisting when he was tasered.

84.    Derek's initial tasering by these heavily armed officers violated national and local law enforcement standards and practices.  Specifically, WPD rules and regulations regarding taser use (1) forbid the use of tasers on passive resistors and explicitly bar their use as a 'prod' or 'come along,' (2) limit the use of tasers to combative, physically aggressive, or actively resisting

individuals, and (3) strictly forbid any use outside of these limited circumstances.

85.    As the electrical current rushed through him, his muscles locked up and he began to shake and convulse uncontrollably.

86.    After this first tasering, several of the heavily armed police officers were close enough to and had the ability to tackle the completely incapacitated Derek, but they deliberately chose not to do so.  For example, the heavily armed officer who had just tasered him followed his actions by moving up the stairs and standing within arms reach of Derek.  This officer could easily have grabbed Derek, but deliberately chose not to do so.

87.    The several seconds of tasering left Derek immobilized, disoriented, weak, and dazed.  As his body shook and convulsed, his empty right hand came out of his pocket and flailed widely.  Due to the electrical current passing through his body, it was physically impossible for Derek to comply with any command to raise his hands above his head.

88.    Such effects of several seconds of tasering are well known.  WPD and DSP officers are supposed to be taught and trained about the effects of taser use on an individual, including recognition of the fact that such a tasering can leave an individual completely immobilized for several minutes and unable to respond to or comply with physical commands given during this time period.

89.    As Derek was being tasered, Ms. Lopez, her six-year-old daughter and her eleven-year-old son were terrified by what was unfolding directly in front of them.  They were scared for their own lives as well as for Derek's.

90.    During the tasering, not knowing the identity of his attackers, Derek stated, "not in front of the kids, get the kids out of here," in an heroic effort to protect these two children from harm by his unknown assailants.  Several of the heavily armed officers heard Derek say this, but

17

they deliberately ignored him and continued to yell at Derek in a loud, disorganized clamor to put his hands up.

91.    Derek however was physically unable to comply due to the fact that he was completely immobilized, disoriented, weak, and dazed from the electrocution he just endured, as well as the sensory overload directed at him.

### 2.    Second Tasering.

92.    Derek was then tasered again.

93.    While he was still recovering and showing no signs of being combative, physically aggressive, or actively resisting, he was tasered a second time for an even longer period of time and left completely immobilized and convulsing uncontrollably.  Derek rolled over onto his side and vomited into the flower bed next to him as a result of the extreme force of the electrical current passing through his body.

94.    WPD and DSP rules and regulations are supposed to teach officers that the physical effects of such longer uses of the taser are even more pronounced and dramatic than with shorter bursts.

95.    Once again, while he was dazed, stunned and paralyzed the Defendants on the scene did not take their third opportunity to reach out, grab, and take Derek into custody, despite the fact that by this point several of the heavily armed police officers were close enough to and had the ability to tackle the completely incapacitated Derek.  But they deliberately chose not to do so.

96.    Mr. Howard Mixson, one of the contractors standing on the street directly in front of the house who witnessed the entire incident then shouted "that's not necessary, that's overkill, that's overkill!"  Angry that their authority was being challenged, one of the heavily armed

18

officers ran over to Mr. Mixson and threatened him, shouting "I'll fucking show you overkill." Fearful for his own life and safety, Mixson immediately stopped asking the police to cease their torturing of Derek.

97.    The heavily armed officers continued to yell at Derek in a loud, disorganized clamor to put his hands up.

98.    Derek however was physically unable to comply due to the fact that he was completely immobilized, paralyzed, disoriented, weak, and dazed from the electrocution he had just endured, sensory overload, and because he had just vomited.

### 3.    Third Tasering.

99.    Derek was then tasered again.

100.    While laying on the ground attempting to recover near a pool of his own vomit and showing no signs of being combative, physically aggressive, or actively resisting, he was tasered a third time in violation of the same WPD and DSP rules and regulations, as well as national and local law enforcement training and practices, regarding taser use discussed above.

101.    After this third tasering, even more of the heavily armed police officers were close enough to and had the ability to tackle the completely incapacitated Derek, but deliberately chose not to do so.  Instead, the heavily armed officers continued to yell at Derek in a loud, disorganized clamor to put his hands up.

102.    As Derek lay there convulsing, he continued trying to remove his left hand from his sweatshirt pocket, but was physically unable to do so due to the paralyzing effects of the repeated taserings he had endured.

103.    Derek then twice shouted, "I'm trying to get my hands out."

104.    At least two of the heavily armed officers heard him yell this, but deliberately

19

ignored his pleas and did not relay them to anyone else on the scene.

105.    Ms. Lopez, who was utterly terrified and had witnessed the entire incident, also heard Derek shout this and yelled at the top of her lungs, "he is trying to get his hands out, he cannot get his hands out!"

106.    All of the officers on the scene heard Ms. Lopez yell this, but they deliberately ignored her pleas.

**H.    Derek Is Slain.**

107.    Instead, without any warning that unless the paralyzed Derek raised both his hands up in the air he would be shot and killed, Defendant Lt. William Browne of the WPD fired three shots into Derek's chest, which eventually killed him.

108.    Under the WPD and DSP continuum of force, prior to the use of firearms, the officers' next step to subdue Derek was to have been to shoot pepper spray into his eyes in order to cause him to reflexively raise his hands to his eyes.  Although each should have been armed with pepper spray in order to cause this reaction, no officer used it.

109.    No immediate steps were taken by any of the Defendants on the scene to render first aid to Derek.  Instead, maliciously they left him for dead.

110.    An autopsy by the Office of the State Medical Examiner revealed that Derek was not under the influence of drugs or alcohol when he was shot.

111.    When he was shot Derek (1) was not combative, physically aggressive, or actively resisting, (2) he was completely paralyzed and unable to comply with commands, (3) did not pose an imminent threat to anyone, (4) did not threaten anyone with a deadly weapon or dangerous instrument, (5) was unarmed throughout, (6) did not have a bulge in his sweatshirt pocket, which indicated that he was not carrying a concealed deadly weapon, and (7) was not trying to escape.

112.    Lt. Browne never identified himself as a police officer before using deadly force.

113.    None of the other heavily armed individuals had ever identified themselves as police officers when Lt. Browne pointed his weapon at Derek and then fired three rounds at point blank range into his stunned and powerless body.

114.    None of these officers gave the slightest warning before this weapon was used to extinguish the life of Derek.

115.    Neither Lt. Browne nor any of the other heavily armed officers believed that Derek posed an imminent threat before using deadly force.

116.    Before the discharge of this weapon, all the officers on the scene had their eyes affixed on all the movements of Derek.

117.    While Defendant Browne fired his weapon, the fact that no other officer on the scene also discharged their weapon indicates that the perception of all those other participants on the scene was that the use of deadly force was unnecessary.

118.    No other officer on the scene believed there was an imminent threat to anyone which justified the use of deadly force.

119.    Normally, when deadly force is necessary in police work and several officers are present on the scene, many more than just one officer discharges his weapon.

120.    Here all the other officers held back, clearly indicating that the use of force was unnecessary.

121.    Before using deadly force, neither Lt. Browne nor any of the other heavily armed individuals believed that Derek had committed a felony involving the infliction or threatened infliction of serious physical injury.

122.    Lt. Browne's actions in shooting Derek posed an unreasonable risk to and

21

endangered the lives and safety of Ms. Lopez, her eleven-year-old son, and her six-year-old

daughter. Lt. Browne's actions created a substantial risk of injury to these innocent third persons.

123.    Other means existed to effect the apprehension of Derek and these means did not

pose an unreasonable threat of imminent serious physical injury to anyone at the scene. These

means included simply asking him to come with them, tackling Derek, hand-cuffing him, or using

other non-lethal weapon's systems which were available, such as pepper spray or beanbag

shotguns.

124.    Lt. Browne failed to exhaust all other reasonable means of apprehension before

using deadly force.

125.    The use of deadly force against Derek by Lt. Browne violated state statutes, such

as 11 Del. Code § 467, WPD and DSP rules and regulations, as well as national and local law

enforcement standards and practices, regarding the use of deadly force.

126.    Lt. Ogden, Sgt. Lester, and the other individual DSP Defendants on the scene had

actual knowledge of and personally directed all of the actions described above. Alternatively,

DSP and WPD supervisors acquiesced, tacitly assented to, or accepted their subordinate's actions

and refused to stop, intervene, or halt these actions despite a clear ability and knowledge of the

need to do so. For example, each of these supervisors had actual knowledge that Derek was a

non-violent, non-threatening individual as described above. Each also had actual knowledge that

Derek did not make any threats whatsoever, even when he was approached by numerous heavily

armed individuals dressed all in black. Each also knew that Derek could be handcuffed

immediately after any of the three taserings and did not intervene to do so. Each also had actual

knowledge that numerous DSP, WPD, and other national and local law enforcement standards

and practices were being violated, yet they refused to order the heavily armed individuals to stand

down, halt, or use less excessive means of force.

127.    Because of their conscious refusal to halt this rogue police tactical operation Derek was killed.

128.    Upon information and belief, when each of the individual DSP Defendants of the rank of Captain and above learned of the death of Derek and the facts of the incident, they ratified and approved the actions of their subordinates, and they began a cover-up of this death which had violated national and local law enforcement standards and practices for the use of force and written rules and regulations.

**I.    DSP Next Lies to the Virginia State Police.**

129.    Later that same day, on orders from his superior officers, including Defendant Lt. Ogden, Defendant Sgt. Randall Hunt, and other individual DSP Defendants then contacted the Virginia State Police ("VSP") and continued the DSP's pattern of deception.

130.    Despite having actual knowledge that there never was an arrest warrant of any kind issued for Derek in Delaware or anywhere else, Sgt. Hunt falsely informed the VSP that a Delaware judge had reviewed sworn affidavits of probable cause from officers within the DSP, had found probable cause, and a Delaware judge had issued an arrest warrant for the now deceased Derek.

131.    It was falsely claimed that after the arrest warrant for Derek was issued, he fled and he "was not immediately apprehended."

132.    It then was falsely stated that, on November 6th, the DSP sought to "arrest Hale on drug charges," and he then was killed.

133.    Sgt. Hunt requested that the VSP rely upon his representation, obtain a search warrant from a Virginia judge, and then search Derek's home in Manassas, VA, where he knew

23

his wife resided and that she would be in grief upon learning of the death of her husband.

134.    On November 7th, the VSP relied upon Sgt. Hunt's false representations and submitted an affidavit of probable cause to a Virginia Magistrate, who then issued a search warrant for Derek's home.

135.    These false statements and omissions were material and necessary to the magistrate's finding of probable cause.

136.    Without these statements and omissions, the Virginia magistrate could not have made a finding of probable cause.

137.    Plaintiff Elaine Hale's home next was illegally searched.

**J.      Use of Excessive Force.**

138.    The surprise and sudden surrounding by at least eleven heavily armed police officers, the three taserings, and the use of deadly force against Derek, each independently restrained Derek's freedom to walk away and constituted five seizures of Derek for Fourth Amendment purposes.

139.    Under the totality of the circumstances discussed above, the actions of the individual Defendants were objectively unreasonable in light of the facts and circumstances confronting them, even without regard to their underlying intent or motivations, which were malicious nonetheless.

140.    For example, consideration of the following factors demonstrates that Defendants' actions were objectively unreasonable:

a)      The individual Defendants never identified themselves as police officers.

b)      The individual Defendants were not wearing police uniforms or displaying police badges, and they did not have the words "POLICE" emblazoned on their chests.

c)    Wiretaps and surveillance performed by Defendants only hours earlier indicated Derek posed no threat.

d)    Derek appeared unarmed to the reasonable observer, and there was no indication due to the prior surveillance that he was carrying a concealed weapon.

e)    Derek's actions did not indicate a criminal motive or intent or that he was undertaking criminal activity as he did not exhibit classic "fight or flight" behavior as the officers approached him.

f)    The officers were not carrying or using ballistic shields to protect themselves from possible gunfire as they approached him or and they did not choose to take cover during the confrontation.

g)    The assault team had Derek outnumbered by at least eleven to one and outgunned by at least eleven to zero.

h)    At the outset of the confrontation, Derek was stunned three consecutive times by three different officers without warning using tasers and was physically incapacitated so as not to pose a threat.

i)    Although the officers were only arms-length away from the debilitated Derek they did not attempt to take him into physical custody.

j)    Derek was not combative, physically aggressive, actively resisting arrest, or attempting to evade arrest by flight but, rather, was trying to comply with police directions when he was tasered then shot.

k)    Derek did not vocally threaten the safety of the officers or others as he was being surrounded, tasered, then shot.

l)    Although no officer acted so as to stop the incident from occurring or escalating, only one officer used his firearm to shoot and kill Derek, indicating that surrounding officers on the scene felt deadly force was not needed.

m)    Upon information and belief, aside from tasers, officers on scene were armed with other non-lethal weapons, such as beanbag shot guns and riot size cap stun canisters.

n)    Defendants executed this operation in the presence of two innocent children and their mother, whose lives were endangered by this recklessness.

o)    It was known that Derek had no criminal record or history of violence.

p)    There was no warrant for Derek's arrest, and there was no probable cause to stop, detain, or arrest Derek.

**K.    History of Failures at DSP.**

141.    Beginning in the fall of 2001, political interference from Governor Ruth Ann Minner and the highest levels of the State of Delaware Executive and Legislative branches began to dramatically erode what once had been high standards of professionalism in the DSP in exercising its primary highway patrol and other secondary law enforcement functions.

142.    Because of this political interference, leadership in the DSP soon became plagued with cronyism and favoritism. A good-old-boy network reared its ugly head and professional standards plummeted, allowing officers like Defendants Ogden and Hunt to advance to leadership positions. Many incompetent and inexperienced officers soon assumed high leadership positions throughout the organization. As a result, operational decisions stopped being made based upon merit, common sense, and sound police strategy.

143.    Because of this leadership crisis, professional standards declined dramatically throughout the ranks of the DSP and this was a proximate cause of Derek's death.

**VII.    ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT.**

144.    As described above, it would be clear to a reasonable police officer that his conduct was unlawful in the circumstances of this case. The police in this case had the opportunity to plan ahead for the tactical operation at issue and faced no surprises on the scene that would have colored the judgment of the officers involved.

145.    The individual Defendants' actions were willful, reckless, oppressive, outrageous and taken with evil motive, in bad faith, out of personal animus, and without any reasonable

grounds to support them.

146.    Under state law, their willful and wanton actions merit an award of punitive damages against each individual Defendant.

147.    All the actions of the individual WPD Defendants were taken pursuant to policies, practices, and/or customs of the City of Wilmington and were authorized, sanctioned, implemented, permitted, and ratified by policymaking officials.

148.    In the first instance, the City of Wilmington has a policy, practice, and/or custom of delegating unfettered discretion to its law enforcement officers in instances such as this in an attempt to formally shield itself from responsibility for unconstitutional uses of deadly force. Specifically, the policy intentionally and deliberately removes municipal policymakers other than the officer on the scene from participation and decisionmaking in such matters and purportedly grants exclusive authority over such decisions to the officer on the scene.  The City's formal segregation of policymaking officials on the Administrative Board from the use of deadly force results by practice or custom in a de facto delegation of policymaking authority to the officer on the scene in this subject area, resulting in the officer on the scene becoming the ultimate policymaker by policy, practice, and/or custom on matters affecting the use of deadly force.

149.    All uses of deadly force by the officer on the scene are authorized, permitted, implemented, sanctioned, ratified, and approved under the above referenced policy, practice, and/or custom.

150.    Additionally, the WPD, and thereby the policymakers of the City of Wilmington, acquiesced in the unconstitutional practices of its officers in the area of the use of deadly force and thereby created an unofficial policy that rewards constitutional violations with promotions.

151.    The WPD, Chief Szczerba or his predecessors, and the department's supervising

27

officers therein are fully aware that Lt. Browne has violated the constitutional rights of others in the past through the improper use of deadly force and has coached other WPD officers on how to lie about and/or justify the improper use of deadly force. Rather then correct these egregious actions, Lt. Browne was promoted from the rank of Sergeant. The promotion of Lt. Browne, his ongoing employment, along with the officers he coached, in the face of these constitutional improprieties, constitutes, at the very least acquiescence, but more aptly an informal policy or custom rewarding the violation of constitutional rights that proximately led to Derek's death.

152.    Furthermore, in light of Lt. Browne's promotion and upon information and belief, despite the knowledge possessed by the WPD, Chief Szczerba or his predecessors, and the department's supervising officers as to the described improprieties of Lt. Browne and the officers he coached, the City of Wilmington failed to take decisive action in investigating, discharging, or reassigning these officers to a position where further, similar constitutional violations could be lessened. To the contrary, the WPD failed to discipline Lt. Browne and made him the commander of the Special Weapons and Tactics team, forcing him to encounter instances where similar egregious and fatal constitutional violations could be made and leading to Derek's death.

153.    By the policy, practice, custom, and/or acquiescence, the City of Wilmington, Chief Szczerba or his predecessors, and the department's supervising officers, proximately caused the denial of Derek's constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

154.    Upon information and belief, the WPD and City of Wilmington failed to properly train WPD officers on the proper use of tasers, the choice of using firearms and deadly force versus tasers, an alternate, non-lethal weapon, or to appropriately react to an individual debilitated by a taser. As none of these instances are readily obvious in the absence of training, these training

28

deficiencies demonstrate a deliberate indifference to avoid the Fourth Amendment violations, complained of herein, by the WPD and the City of Wilmington that proximately led to the unnecessary and excessive tasering of Derek prior to his being shot to death.

155.    Upon information and belief and due to Derek's death, the City of Wilmington and the WPD have actual or constructive knowledge as to the training deficiencies described above, but have failed to act.  WPD officers continue to be permitted to be armed with both tasers and firearms absent any measures to address and/or correct these training deficiencies.  This constitutes a pattern demonstrating deliberate indifference on the part of the WPD and the City of Wilmington to properly prevent similar constitutional violations.

156.    The actions of the Defendants and their agents or employees were reckless, intentional, and malicious, so as to merit an award of punitive damages against each individual Defendant.

157.    Defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

158.    The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiffs, and the exercise of these rights was a motivating, substantial, or determinative factor in all actions adverse to plaintiffs.

159.    The Defendants' actions constitute an abuse of governmental power.

## VIII.  DAMAGES.

160.    As a direct and proximate result of the actions of the Defendants, as detailed herein, plaintiffs have suffered or will suffer damages which include, but are not limited to, damages under state law for a survival action and for a wrongful death action, as well as damages separately under federal common law rules for damages.

29

a)   The conscious suffering, emotional pain, terror, mental anguish, loss of enjoyment of life, mental and physical pain, and physical injuries suffered by Derek as he was tortured by repeated tasering and then shot and killed by three bullets and left without medical attention to die.

b)   The deprivation of the expectation of pecuniary benefits which would have resulted from the continued life of the deceased and which would have flowed to his wife and each of his parents, including but not limited to the loss of wages, earnings, benefits, retirement and pension benefits, and contributions for support Derek would have made over the lifetime of his wife and each of his parents.  Derek would have been a high income earner since he was seeking a college degree in order to have a career in federal law enforcement and he was eminently qualified to succeed in such a career because of his personality, good character, bravery and the leadership qualities which he had demonstrated in the USMC.

c)   Reasonable funeral expenses.

d)   Loss of civil rights found in the U.S. Constitution.

e)   Garden variety emotional distress, mental anguish and other suffering and loss of companionship for the plaintiffs who have suffered injury in fact and who must live the rest of their lives without their beloved husband and son.

f)   Punitive damages.

## COUNT I: AGAINST ALL INDIVIDUAL WPD DEFENDANTS, LT. BROWNE, CHIEF SZCZERBA, CITY OF WILMINGTON

### EXCESSIVE FORCE (TASERING) IN VIOLATION OF 42 U.S.C. § 1983

161.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

162.   In violation of 42 U.S.C. § 1983, the actions of the on-scene individual WPD defendants violated Derek's constitutional rights to be free from unreasonable seizures as guaranteed to him by the Fourth and Fourteenth Amendments to the United States Constitution, when he was tasered three consecutive times.

163.   As described by non-participant eyewitnesses, Derek's seizure by those officers

30

tasering him was objectively unreasonable as Derek was not charged with any crime, he did not appear to pose an immediate threat to the officers or others, did not appear emotionally disturbed, and he was not trying to resist or evade arrest.

164.    The three individual WPD defendants that actually tasered Derek knew that the actions being taken against Derek were unreasonable, per the written policies of the WPD on the use of tasers found in the WPD White Book, the department's policy manual and, therefore, excessive in light of the facts and circumstances confronting them

165.    For example, (1) prior to using the taser, the officers did not identify themselves as police officers, (2) they did not give a verbal warning concerning the use of the taser, (3) they were not knowingly threatened with a deadly weapon or dangerous instrument, (4) the officers did not have probable cause to believe that the suspect posed an imminent threat of serious physical harm to the officers or others, (5) other means existed to effect the arrest and there was no probable cause to believe that the suspect had committed a felony involving the infliction or threatened infliction of serious physical injury, (6) the suspect who was tasered was not combative, physically aggressive, or actively resisting, (7) the taser was wrongly being used as a "come-along" device against at most a passive resistor.

166.    Derek's unreasonable seizure was also the result of the remaining on-scene individual WPD defendants and Lt. Browne's tacit and approving silence as to the each of the three tasering officers' unjustified assaults.  This silence endorsed the constitutional violation resulting from the illegal use of force and furthered the escalation of the assault leading to Derek's eventual death.

167.    Derek's unreasonable seizure was also the result of the WPD and Chief Szczerba's or his predecessors' failure to properly supervise and discipline their officers in light of past

instances of police misconduct, resulting in possible constitutional violations by many of the same officers that proximately caused Derek's suffering and death. Rather than discipline or correct the actions of these officers, their prior actions led to promotions and command positions within the WPD. The decision by the WPD and Chief Szczerba or his predecessors to reward, rather than discipline, these officers led to an unofficial custom or policy of deliberate indifference to the constitutional rights of persons such as Derek Hale and proximately caused the excessive use of force used upon him when he was tasered three consecutive times in violation of his constitutional right to be free from unreasonable seizures.

168.    Derek's unreasonable seizure was also the result of the WPD's failure to properly train its officers in the appropriate use of tasers and to understand the effects of tasers on the targeted individual. Arming officers with non-lethal weapons while simultaneously failing to properly train them on their use and effects demonstrates a deliberate indifference on behalf the WPD as to the constitutional violations that could, and in fact did, occur when Derek was seized through the use of excessive force.

169.    As a result of the use of excessive force by way of being tasered three consecutive times in violation of Derek's rights guaranteed by the Fourth and Fourteenth Amendments, Derek was damaged in that he felt conscious suffering, emotional pain, terror, mental anguish, and suffered mental and physical pain and injury as he was repeatedly tortured by repeated tasering.

**COUNT II: AGAINST LT. BROWNE, ALL INDIVIDUAL WPD DEFENDANTS, THE ON SCENE INDIVIDUAL DSP DEFENDANTS CHIEF SZCZERBA, AND THE CITY OF WILMINGTON**

**EXCESSIVE FORCE (SHOOTING) IN VIOLATION OF 42 U.S.C. § 1983**

170.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

171.    In violation of 42 U.S.C. § 1983, the actions of Lt. Browne, the individual WPD defendants and the on scene individual DSP defendants violated Derek's constitutional rights to be free from unreasonable seizures as guaranteed to him by the Fourth and Fourteenth Amendments to the United States Constitution that occurred when he was shot three times in the chest causing him to die.

172.    As described by non-participant eyewitnesses, the shooting death of Derek Hale at the hands of Lt. Browne was objectively unreasonable given the totality of the circumstances, as Derek was not charged with any crime, did not appear to pose an immediate threat to the officers or others, did not appear to be emotionally disturbed, and was not trying to resist or evade arrest. In fact, at the time of his being shot three times, any threat posed by Derek had been rendered less than that which justifies the use of deadly force by his being incapacitated by three previous taserings.

173.    As the SWAT team's commanding officer Lt. Browne was well aware, or should have been well aware, shooting Derek was unreasonable per the written policies of the WPD on the use of deadly force found in the WPD White Book, the department's policy manual, and therefore excessive in light of the facts and circumstances confronting them.

174.    For example, (1) prior to using a firearm, the officers did not identify themselves as police officers, (2) they did not give a verbal warning concerning the use of deadly force, (3) they were not knowingly threatened with a deadly weapon or dangerous instrument, (4) they were aware that discharging the weapon unreasonably endangered innocent bystanders, (5) the officers did not have probable cause to believe that the suspect posed an imminent threat of serious physical harm to the officers or others, and (6) other means existed to effect the arrest and there was no probable cause to believe that the suspect had committed a felony involving the infliction

33

or threatened infliction of serious physical injury.

175.    Derek's unreasonable seizure was also the result of the remaining on-scene individual WPD defendants' tacit and approving silence as to the escalation of the incident and the eventual shooting by Lt. Browne.  Despite his being the unit's commander, each officer had an affirmative duty to intervene and stop the unconstitutional actions.  The individual WPD defendants on scene failed to first stop or voice issue over the taserings and then permitted their commander to shoot Derek three times in the chest.  Their silence endorsed the constitutional violation resulting from the illegal use of force that led to Derek's death.

176.    Each DSP trooper on the scene also knew that the actions being taken against Derek violated written policies of the DSP on the use of deadly force found in the DSP Policy Manual at 1.3.1 and 1.3.9.

177.    For example, (1) all other reasonable means of apprehension had not been exhausted, (2) the intended arrest was not for a felony involving serious physical injury or the threat thereof, (3) the use of deadly force endangered innocent civilians, (4) the failure to use deadly force did not create a substantial risk that the person to be arrested will cause death or serious physical injury to others if the apprehension was delayed, (5) neither was the use of deadly force necessary to prevent the commission of a crime, because neither precondition had been met in that innocent civilians would have been endangered and there was no substantial danger that death or serious physical injury would be caused to another person if the crime was not prevented by the use of deadly force.

178.    Derek's death through the unconstitutional use of excessive force was also the result of the WPD and Chief Szczerba's or his predecessors' failure to properly supervise and discipline Lt. Browne when they had actual and constructive knowledge that Lt. Browne had

previously coached other officers to lie in order to justify the use of deadly force in violation of constitutional rights. The decision by the WPD and Chief Szczerba or his predecessors to promote and place Lt. Browne in command of a SORT team, rather than discipline him, fostered an unofficial custom or policy of deliberate indifference to the constitutional rights of persons such as Derek Hale and proximately caused the excessive use of force used upon him when he was shot in violation of his constitutional right to be free from unreasonable seizures.

179.    Derek's unreasonable seizure was also the result of the WPD's failure to properly train its officers on the appropriate use of deadly force, choice of non-lethal means, and the use of deadly force when combined with the application of non-lethal weapons such as tasers. Arming officers with both non-lethal and lethal weapons, while simultaneously failing to properly train them on their use and effects demonstrates a deliberate indifference on behalf the WPD as to the constitutional violations that could, and in fact did, occur when Derek was killed through the use of excessive force.

180.    Derek's unreasonable seizure and eventual death was also the result of training deficiencies resulting from Defendant MacLeish's 2003 decision to terminate annual "realistic interactive scenario based training" for all Delaware State Troopers who would learn how to react to and face situations like that posed by the tactical situation involving Derek. This failure to train resulted in Derek's death.

## COUNT III: AGAINST ALL DEFENDANTS

## CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1983

181.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

182.    The attempted arrest, seizure, and death of Derek Hale were overt acts committed

by the DSP and WPD, acting in concert and in agreement, to inflict a constitutional wrong against Derek in violation of 42 U.S.C. § 1983. As a result of their working in unison, Derek was ultimately tortured and killed by the DSP and WPD, thereby depriving him of his Fourth Amendment guarantee to be free from unreasonable seizures.

183.    The actions to deprive Derek of his life and liberty began when the head of the DSP, Defendant MacLeish, targeted members of the Pagan Motorcycle Club, of which Derek was a member. Upon information and belief, if not for Defendant MacLeish's orders to his senior supervisors and the DSP agreements with WPD leadership, such as Chief Szczerba, and its eventual complicity in carrying out the deprivation of constitutional rights of persons such as Derek Hale, the aforementioned events would not have occurred.

184.    On the days leading up to Derek's killing, DSP officers, namely Lt. Ogden, Sgt. Lester, Sgt. Hunt, Sgt. Parton, and other individual DSP defendants, were providing intelligence and manpower to WPD units, as well as working with WPD units to maintain surveillance on Derek. Upon information and belief, these interactions were the result of agreements made and a meetings of the minds between the DSP, its leadership, and its officers and the WPD, its leadership, and its officers.

185.    Upon information and belief, members of the DSP and WPD colluded to withhold the full extent of the wiretap records from members of the SWAT and SORT units that would have painted a proper picture of Derek Hale as an unarmed and non-hostile party, prior to the assault. Instead, the DSP and WPD chose to vilify Derek to SWAT and SORT unit members in order to further their conspiracy to violate his civil rights.

186.    The DSP had Derek under electronic and visual surveillance the entire weekend before his death and knew that he was in New Castle County, Delaware. Even though it is their

policy and practice to do so, the DSP refused to take any suspicions about Derek to a judicial officer to obtain an arrest warrant because there was no probable cause to arrest him and a judicial officer would have so declared.

187.    DSP officers Lt. Ogden, Sgt. Lester, Sgt. Hunt, Sgt. Parton, Captain Simpson, Major Homiak, Major Papili, Col. MacLeish, and/or the other individual DSP defendants who authorized, sanctioned, ratified, or approved the tactical operation were aware of the long-term investigation which involved Derek and, upon information and belief, knew that his record was clean and he posed no threat to the assaulting SORT unit.

188.    Upon information and belief, the tactical team that accosted, tasered, then shot Derek was a joint team consisting of members of both the DSP and the WPD, acting on intelligence or reports received from DSP intelligence and surveillance units.  Neither DSP or WPD officers attempted to stop the actions undertaken by the individual WPD defendants that tasered Derek or Lt. Browne in his shooting of Derek.  The non-actions and complicity of the officers on scene directly led to the deprivation of Derek's right to be free from unreasonable seizures and led to his death.

189.    Each Defendant set in motion a series of acts by others which he knew or reasonably should have known would cause officers of the WPD to inflict unlawful harm on Derek.  These acts or omissions were the proximate cause of the tasering and death of Derek.

## COUNT IV: AGAINST ALL DSP DEFENDANTS

## ILLEGAL SEARCH AND SEIZURE IN VIOLATION OF 42 U.S.C. § 1983

190.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

191.    In violation of plaintiff Elaine Hale's Fourth Amendment protection from

37

unreasonable searches, DSP Defendants purposefully made false statements and omissions of material facts in their communications with the VSP to improperly secure a warrant to search Derek and Elaine's home.  DSP Defendants intended to and did in fact mislead the VSP and, thereby, the Virginia State courts on issues critical to a finding of probable cause and recklessly disregarded the truth of their representations.

192.    Without these statements and omissions, the Virginia magistrate could not have lawfully authorized the search of Derek and Elaine's home.

193.    As a direct and proximate result of the actions of the Defendants, Elaine Hale was humiliated, suffered lost wages, and experienced extreme emotional distress and mental anguish.

194.    Elaine Hale's constitutional right to be free from illegal search and seizures has been denied under the Fourth and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983.

## COUNT V: AGAINST ALL DEFENDANTS

## EXCESSIVE FORCE IN VIOLATION OF SECTION 6 OF THE DELAWARE CONSTITUTION

195.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

196.    Defendants' conduct violated, in a similar manner as described above, the rights guaranteed to Derek by Article 6 of the Delaware Constitution.

## COUNT VI: AGAINST ALL OFFICERS ON SCENE

## ASSAULT AND BATTERY

197.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein, and further allege as follows:

38

198.    In forcefully approaching Derek with their guns drawn and without properly identifying themselves as police, Defendants' placed Derek in apprehension in imminent, harmful, or offensive contact.

199.    Defendants use of excessive and unjustified force resulted in Defendants' intentional infliction of bodily harm against Derek without his consent violating his right to be free from assault and battery under the common law of the State of Delaware.

200.    Defendants conduct exhibited wanton negligence and willful and malicious intent.

## COUNT VII: AGAINST ALL DEFENDANTS

## SURVIVAL AND WRONGFUL DEATH ACTIONS

201.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein, and further allege as follows:

202.    As a direct and proximate result of the actions of the Defendants, Derek was forced to endure great conscious pain, suffering, and other torment before his death.

203.    Derek's Estate is entitled to damages for the conscious pain and suffering, torment, and other losses permitted under the Delaware Survival Statute. 10 Del. Code § 3701, et seq.

204.    As a direct and proximate result of the actions of the Defendants, Elaine Hale, Derek's surviving spouse and next of kin, was deprived of expected pecuniary benefits, contributions for support, and the marital and household services that she would have received from Derek absent his death.

205.    As a direct and proximate result of the actions of the Defendants, Elaine Hale, Derek's surviving spouse and next of kin, suffered great mental anguish and incurred funeral expenses.

39

206.    As a direct and proximate result of the actions of the Defendants, Dennis and Connie Hale, as Derek's parent, were deprived of expected pecuniary benefits and contributions for support they would have each individually received from Derek absent his death.

207.    Elaine, Dennis, and Connie Hale are entitled to compensatory damages for these injuries under 10 Del. Code § 3724.

## IX.    PRAYER FOR RELIEF

**Wherefore**, plaintiffs pray that the Court:

i.      Enter judgment against the Defendants.

ii.     Enter a declaratory judgment declaring the acts of the Defendants to be a violation of Derek and Elaine Hale's constitutional rights.

iii.    Enter a judgment against the individual Defendants, and the City of Wilmington, jointly and severally, for compensatory damages in favor of each of the three individual plaintiffs for Derek's wrongful death.

iv.     Enter separate judgments against the individual Defendants for punitive damages for the wrongful death of Derek Hale and, under State law, for punitive damages against the City of Wilmington for Derek's wrongful death.

v.      Enter a judgment against the individual Defendants and the City of Wilmington for compensatory damages in favor of the Personal Representative of the Estate of Derek Hale for his conscious pain and suffering under the survival statute.

vi.     Enter a judgment against the individual Defendants, for punitive damages in favor of the Personal Representative of the Estate of Derek Hale under the survival statute and under State law, against the City of Wilmington for punitive damages under the survival statute.

vii.    Enter a judgment against the individual DSP Defendants, jointly and severally, for compensatory damages in favor of Elaine Hale for the illegal search of her home.

viii.   Enter separate judgments against the DSP Defendants, jointly and severally, for punitive damages in favor of Elaine Hale for the illegal search of her home.

ix.     Issue a reparative injunction directing that all Defendants, both individually and officially, apologize to plaintiffs, in writing, for the death of Derek Hale, the violation of his constitutional rights, and for the illegal search of Elaine Hale's

home.

x.   Issue a reparative injunction directing that the individual Defendants issue public
     written apologies to plaintiffs and run their apologies in the News Journal, the
     Delaware State News, and in print media in the metropolitan Washington, D.C.
     area, Northern Virginia, and in the State of Missouri for the death of Derek Hale
     and violations of his constitutional rights.

xi.  Issue a mandatory injunction requiring all officers of the WPD to receive remedial
     training in the use of tasers and deadly force and that all troopers of the DSP
     receive similar training.

xii. Enter a judgment against all the individual Defendants, the City of Wilmington, and
     the Division of State Police, Department of Safety and Homeland Security, State
     of Delaware for plaintiffs attorneys' fees, costs and pre- and post-judgment interest
     for this action.

xiii. Require such other and further relief as the Court deems just and proper under the
      circumstances.

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE  19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

**ARNOLD & PORTER L.L.P.**

**RANDAL SHAHEEN, ESQ.**
**RYAN RICHARDSON, ESQ.**
**JENNIFER RISEN, ESQ.**
**ALEXANDER MAJOR, ESQ.**
555 12th Street, NW
Washington, DC  20004
202 942 5000 (phone)
202 942 5999 (fax)

**OF COUNSEL:**

**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
**THE RUTHERFORD INSTITUTE**
P.O. Box 7482
Charlottesville, Virginia  22906
(434) 978 3888

*Attorneys for Plaintiffs Elaine Hale and the Estate of*
*Derek J. Hale and cooperating attorneys for The*
*Rutherford Institute*


**JACOBS & CRUMPLAR, P.A.**

 /s/ Robert Jacobs
**ROBERT JACOBS, ESQUIRE (#244)**
**THOMAS C. CRUMPLAR, ESQUIRE (#942)**
Two East Seventh Street, Suite 400
Wilmington, DE 19801
(302) 656-5445
Bob@JandCLaw.com
Tom@JandCLaw.com

*Attorneys for Plaintiffs Dennis W. Hale and*
*Connie M. Hale*

Dated: April 16, 2007

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

April 16, 2007, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

> Ralph K. Durstein III, Esquire
> Department of Justice
> Carvel State Office Building
> 820 N. French Street
> Wilmington, DE 19801
> Ralph.Durstein@state.de.us

I also certify that I served this **Pleading** by e-mail on the following individuals:

> Rosamaria Tassone, Esquire
> City of Wilmington Law Dept.
> 800 French Street
> Wilmington, DE 19801
> RTassone@ci.wilmington.de.us
>
> John A. Parkins, Jr., Esquire
> Richards Layton & Finger
> One Rodney Square
> 920 North King Street
> Wilmington, DE 19801
> Parkins@rlf.com

> /s/ Stephen J. Neuberger
> **STEPHEN J. NEUBERGER, ESQ.**